HUGH J. WALLACE and MINNIE WALLACE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Commissioner
Wallace v. Commissioner
Docket No. 35455-83.
United States Tax Court
T.C. Memo 1985-606; 1985 Tax Ct. Memo LEXIS 26; 51 T.C.M. (CCH) 94; T.C.M. (RIA) 85606; December 12, 1985. Shirley M. Justice, for the petitioners. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1978 in the amount of $3,134.70. The issue for our decision is whether petitioner (Mr. Wallace) is entitled to deduct in 1978 worthless debts of AAA Wood Products, Inc., in the amount of $142,500 as business bad debts under section 166(a)(1) [1] or is limited to the deduction of a nonbusiness bad debt provided for in section 166(d)(1). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Saratoga Springs, New York, at the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1978 with the office of the Director, Internal Revenue Service Center, Atlanta, Georgia. Mr. Wallace (petitioner), *28 a Canadian citizen, is a cash basis taxpayer who resided in Mobile, Alabama, from August 1974 until 1980, as a resident alien. Prior to 1974, petitioner was employed in Canada by Domtar, Ltd., for 22 years in the wood preserving and lumber business. During his employment, he became acquainted with Thomas Knox, a Canadian citizen who operated Wood Preservation Industries, Ltd., and who was a part owner of its stock. In 1967, Mr. Knox acquired a wood preservation and treating plant in Mobile, Alabama, called Alabama Wood Treating, Inc. (Alabama Wood). In early 1974, the resident manager and then president of Alabama Wood informed Mr. Knox that he wished to retire. Mr. Knox thereafter requested petitioner to resign his employment with Domtar and move to Mobile to work for Alabama Wood. In August 1974, petitioner accepted Mr. Knox's offer and moved to Mobile to become vice president of Alabama Wood and within 10 months, he was named president of Alabama Wood. At that time and for all times relevant to this case, Mr. Knox owned 100 percent of the stock of Alabama Wood which had a wholly owned subsidiary, Alabama Wood Treating International, Inc., and electing DISC corporation. *29 Alabama Wood's major business was purchasing wood products, such as utility poles and cross-ties from suppliers located in the United States, treating the wood with chemical preservatives, and selling the treated wood to foreign buyers in the export market. Mr. Knox and petitioner, together with a third individual, Samir Morcos, were equal owners of a separate DISC corporation, KMW International, Inc. (KMW,) which sold many of the products of Alabama Wood in the export market. Alabama Wood Treating International, Inc., also sold Alabama Wood's products in the export market. Petitioner was paid a basic salary for his services to Alabama Wood and also received a commission based upon 15 percent of the consolidated income (before taxes) of the corporations in the form of a consulting fee. Petitioner reported the following amounts of income from the sources indicated on his Federal income tax returns for the years indicated: 1975
1976
1977
1978
Salary/Alabama Wood
$25,516
$23,100
$25,030
$4,946
Salary/KMW
3,000
6,000
2,500
Bonus/Consulting/Alabama Wood
80,086
94,144
28,812
Deemed Dividends/KMW
17,983
35,909
Caroga Park Co., Inc.
3,779
Misc. (Interest etc.)
352
9,051
10,025
6,744
TOTAL
$126,937
$171,983
$37,555
$40,502
*30 Petitioner's total earnings for the 4-year period from 1975 to 1978, were $376,977. His earnings from Alabama Wood for that 4-year period were in the amount of $281,634 or 74.7 percent of his total earnings. In the years following petitioner's arrival at Alabama Wood, Sales were relatively good. The plant was operating at near capacity, utilizing three working shifts a day. Alabama Wood was located on land leased from the Gulf, Mobile and Ohio Railroad Company by lease dated April 1, 1972. The lease was for a term of 10 years and thus would expire on March 31, 1982. Since the plant was operating at capacity, Alabama Wood needed additional room for expansion; however, no land was available for expansion at the plant's existing site. Alabama Wood began looking for property for expansion outside of the immediate vicinity of the existing plant. Three or four sites were inspected for possible construction of another plant but all of the sites were unsatisfactory for various reasons. During 1974 and 1975, petitioner became acquainted with Dr. Frederick Whiddon, who was president of the University of South Alabama in Mobile. Dr. Whiddon owned 40 percent of the stock of AAA Wood *31 Products, Inc. (AAA), of Abbeville, Alabama.AAA was a lumber manufacturer that purchased raw timber and produced various lumber products including cross-ties, utility poles and cross-arms. It also purchased these products for resale. The president of AAA was Wade Whiddon and the secretary-treasurer was B. J. Whiddon. AAA was a supplier of cross-ties and utility poles to Alabama Wood which would chemically treat these products and resell them. Only 1.7 percent of the untreated wood that Alabama Wood bought from 1975 to 1978 was purchased from AAA. In May 1976, Hexagon International, N.V. (Hexagon), petitioner's wholly owned Dutch Antilles corporation, purchased 400 shares or 20 percent of the stock of AAA from Dr. Frederick Whiddon for $30,000 cash and a promissory note to Dr. Whiddon for $70,000. Petitioner never satisfied this $70,000 note. By July 1977, the stock of AAA was owned equally (20 percent each) by Walter Calton, Dr. Frederick Whiddon, Wade Whiddon, B. J. Whiddon and Hexagon (petitioner's wholly owned corporation). Dr. Frederick Whiddon showed petitioner a parcel of land in Abbeville adjacent to AAA's plant which was available for development. Petitioner was *32 of the opinion that it would be beneficial for a wood treatment plant to be adjacent to a processing plant such as that operated by AAA. During 1976 a new corporation, Abbeville Wood Products Company, Inc. (Abbeville Wood), was established by Mr. Knox, Dr. Whiddon and petitioner. The stock of Abbeville Wood was owned: 62 percent by Kokomo N.V., which was a Dutch Antilles corporation owned 100 percent by Mr. Knox; 19 percent by Hexagon, which was a Dutch Antilles corporation owned 100 percent by petitioner; and 19 percent by Dr. Frederick Whiddon. Abbeville Wood was established to perform the same type functions as Alabama Wood in treating wood products but on an expanded basis since it was planned that it would treat lumber in addition to treating wood products such as cross-ties and utility poles. Petitioner's wholly owned corporation, Hexagon, paid $50,000 for 19 percent of the stock in Abbeville Wood. The wood treatment plant for Abbeville Wood was to be placed on the parcel of land adjacent to the AAA operation which Dr. Whiddon had shown to petitioner. Construction of the Abbeville Wood plant was to be financed by a loan from the Merchants National Bank of Mobile in the *33 amount of $700,000. The loan, made in June 1977, was classified by the Comptroller of the Currency in December 1977, and the credit lines of Abbeville Wood, Alabama Wood and KMW were put together into a single line of credit. A loan is classified by the Comptroller of the Currency when it is determined that there is a commingling of funds between borrowers and the borrowers are thus not separate entities. The effect of classification is to limit the credit line of all the classified borrowers to the legal loan limit for one borrower. As a result of this classification in 1977, it was difficult if not impossible for Abbeville Wood to receive further credit. In November 1976, petitioner organized Walliz, Inc. He was its sole shareholder and only employee. The corporation was organized to provide chemical products as well as management and consulting services to various companies in which petitioner was involved. In his capacity as an employee at Walliz, Inc., petitioner established a chemical mixing facility for AAA and sold chemical products to AAA. Petitioner also performed consulting services for KMW (which was owned equally by Mr. Knox, Mr. Samir Morcos, and petitioner) *34 and Abbeville Wood pursuant to consulting agreements with those companies. During the construction period of Abbeville Wood's plant and until funds were depleted, petitioner received a $25,000-a-year management fee through Walliz pursuant to a management agreement between Walliz and Abbeville Wood. As of 1979, AAA owed Walliz $73,000 for services and products and AAA was never able to pay this amount. On May 11, 1976, AAA signed a promissory note in the amount of $10,000 payable on demand to Hexagon. On May 19, 1977, AAA signed a promissory note in the amount of $40,000 payable to petitioner. From November 1976 through March 1978, petitioner made loans totalling $142,500 to AAA. The proceeds of the loans were generally used in the operation of the business and provided working capital. As on July 31, 1978, three of the other stockholders of AAA had made loans to AAA: Dr. Frederick Whiddon had loaned $189,948.19 to AAA, B. J. Whiddon had loaned AAA $325,374.12, and Walter Calton had loaned AAA $31,000.00. During the year in issue, petitioner was president of Abbeville Wood, Walliz, Inc., KMW and Hexagon. He was also president of Alabama Wood until August 1978 at which time *35 he resigned to become president of AAA. In 1978, the shareholders of AAA, Abbeville Wood, Deloney Wood Products, which was wholly owned by Mr. Knox, and A&T Steam Company, which was a sole proprietorship wholly owned by Dr. Whiddon, prepared various documents in conjunction with a proposed merger of the companies. This conglomeration never occurred. In September 1978, in connection with a loan application of Abbeville Wood and the other companies which it was contemplated might be merged with Abbeville Wood, an organizational chart was prepared showing that petitioner was to be president of the proposed conglomerate and B. J. Whiddon was to be petitioner's assistant. In September 1978, when petitioner became president of AAA, both AAA and Abbeville Wood were in severe financial difficulty. Petitioner spent practically all of his time after becoming president of AAA preparing a loan request for $7 million to the Farmers Home Administration (FHA). The loan package was presented to the FHA in February 1979. The purpose of the loan was to secure long-term financing for the combined properties and projects at Abbeville Wood and AAA. At that time Mr. Knox loaned $200,000 to AAA. *36 The FHA loan request was rejected and after an appeal was again rejected, AAA filed a petition in bankruptcy for a Chapter XI arrangement on May 1, 1979, and AAA was adjudicated a bankrupt of May 24, 1979, by the United States District Court for the Middle District of Alabama. Petitioner was a shareholder of AAA from early 1976 until its bankruptcy in 1979. Petitioner was not an employee or officer of AAA until September 1978, when he became president of the corporation. At that time petitioner was authorized a salary of $50,000 per year, but he never received a salary from AAA in any amount during his association with the company. Abbeville Wood never commenced operation and did not make a profit for any of the years from 1975 through 1978. Petitioner did not have an agreement to receive a salary from Abbeville Wood for his services as president and received no compensation as president of Abbeville Wood. Alabama Wood made a profit for each of the years 1975 through 1978. Petitioner resigned his position at Alabama Wood to devote his full time to Abbeville Wood and AAA partly due to discussions he had with Mr. Knox in the summer of 1978 in which it was decided that petitioner's *37 management expertise was needed to manage those failing companies more than to manage Alabama Wood. In addition, petitioner was eager to manage the companies in which he was a stockholder rather than continuing to be an employee of Alabama Wood. Petitioner left Alabama Wood of his own free will. Mr. Knox was completely satisfied with petitioner's performance at Alabama Wood at the time of his departure. Petitioner was not told when he left Alabama Wood that Alabama Wood would cease operation or that petitioner's job with Alabama Wood was in jeopardy. In 1979 petitioner ceased his employment with all of the aforementioned companies and was never thereafter hired by Mr. Knox to work in any company in which he had an interest. On their 1978 Federal income tax return, petitioners claimed a business bad debt deduction in the amount of $142,500 and claimed that this loss resulted from loans of that amount to AAA. In his notice of deficiency issued to petitioners for the taxable year 1978, respondent disallowed petitioners' claimed bad debt deduction with the following explanation: The deduction of $142,500 shown on your return as a business bad debt resulting from transfers of that *38 amount to AAA Wood Products, Inc. is disallowed for lack of substantiation that a debt actually existed. [2] If, however, it is found that these transfers were loans, the debt was a nonbusiness bad debt because it was a personal loan and not created in connection with your trade or business. In the latter event, the loss is subject to the limitation of section 1211 of the Internal Revenue Code. At the trial respondent conceded that petitioner made loans of $142,500 to AAA and that these loans became worthless in 1978. OPINION Section 166(a) provides a deduction for debts that become worthless in a taxable year. However, section 166(d) provides that a nonbusiness debt of a noncorporate taxpayer which becomes worthless shall be treated as a short-term capital loss. Unless a debt is created or acquired in connection with a taxpayer's trade or business or is a debt the loss from the worthlessness of which is incurred in a taxpayer's trade or business, it is a nonbusiness bad debt. Section 166(d)(2). Here, the funds petitioner lent to AAA were spent in AAA's business. Petitioner, however, contends *39 that the loans were made by him to protect his employment with Abbeville Wood and AAA and in anticipation of salary income from these corporations. The question whether a debt is a business or nonbusiness debt is a question of fact. Smith v. Commissioner,60 T.C. 316, 318 (1973). In order for petitioner to be entitled to treat the debt as a business debt, he must show that he was engaged in a trade or business at the time the debt was created and that the debt had a proximate relationship to his trade or business. A showing that he was engaged in an income or profit making activity will not satisfy the narrower category of "trade or business." Whipple v. Commissioner,373 U.S. 193 (1963). A proximate relation between the loss and the taxpayer's trade or business sufficient to qualify the debt as a business debt exists if considerations connected with the taxpayer's own trade or business were dominant in motivating the taxpayer to lend the money to the corporation. United States v. Generes,405 U.S. 93 (1972). Therefore, to be entitled to his loss from worthless debts of $142,500 as a business bad debt, petitioner must prove *40 that his dominant motive in making the loans was to protect his salary and job rather than merely to protect his stock investment in AAA. United States v. Generes,supra at 100, 106; Benak v. Commissioner,77 T.C. 1213, 1217-1218 (1981), affd. 682 F.2d 207 (9th Cir. 1982). Respondent argues that petitioner was not in the trade or business of loaning money to companies or of developing companies for resale or the trade or business of managing wood and wood-related companies. Respondent contends that at the time petitioner made the loans to AAA, his only trade or business was being an employee of Alabama Wood. Respondent argues further that petitioner's motive, and certainly his dominant motive, was to protect his stock investment in AAA and Abbeville Wood. Respondent points out that petitioner was not an employee or officer of AAA when the loans were made and received no salary from that company and argues that petitioner's only source of gain from AAA would be in the form of future appreciation of his investment or future income or dividends from the company. Respondent states that these returns are not returns from petitioner's *41 trade or business. Petitioner contends that the loans made to AAA should be deductible in full as a business bad debt loss because he made the loans to AAA to protect an anticipated salary from either AAA or Abbeville Wood. [3] Petitioner distinguishes Putnam v. Commissioner,352 U.S. 82 (1956), and Whipple v. Commissioner,supra, in which the Supreme Court held that loans made by taxpayers to corporations in which they were shareholders constituted nonbusiness debts, on the basis that the taxpayer-stockholders in those cases had solely an investment motivation since the creditor companies engaged in businesses totally unrelated to the taxpayers' means of earning a livelihood. Petitioner argues that he and AAA had been engaged in identical trades or businesses for over 20 years. Petitioner argues that he invested only in companies which were directly related to his specific means of earning a livelihood, which was management and sales in the wood and lumber business.
*42 On the basis of this record, petitioner's only business was being an officer or employee of a company engaged in the wood and lumber business. The fact that petitioner's corporate employers were engaged in the wood and lumber business does not cause that business to be petitioner's business. Whipple v. Commissioner,supra.Therefore, in order for petitioner to be entitled to the claimed business bad debt deduction, he must show that the loans were proximately related to his business of being a corporate employee or officer. This record shows that petitioner was not an officer or employee of AAA and at the time the loans were made it was not contemplated that he would be. It was not until September 1978, when petitioner discussed his situation with Mr. Knox and decided that he would leave his position with Alabama Wood, that his becoming an officer of AAA was contemplated. The record is clear that two of petitioner's loans to AAA were made prior to that time and the indication from the record is that all of them were made prior to that time. Petitioner in his argument recognizes the weakness of his position that the loans were made to protect his employment *43 or anticipated employment by AAA and therefore contends that the loans were made to protect his employment and anticipated salary from Abbeville Wood. For such a contention to have any validity, petitioner must show how loans to AAA would be proximately related to his employment or anticipated employment with Abbeville Wood. This record shows that being adjacent to a wood processing plant such as AAA would be helpful to a wood treatment plant such as it was contemplated would be operated by Abbeville Wood. However, there is nothing in this record to indicate a sufficient relationship between AAA and Abbeville Wood for us to conclude that loans made to AAA might benefit the business of Abbeville Wood. Certainly nothing in this record shows that loans to AAA should be considered as created in the trade or business of petitioner as an officer of Abbeville Wood, even if being an officer without a salary could be considered a trade or business, or if petitioner's anticipated salary as an officer of Abbeville Wood could be considered as a trade or business of petitioner. Therefore petitioner has totally failed to show that the loans he made to AAA were created or related to any trade or *44 business of his. Rendering service for pay as an employee is a trade or business for purposes of section 166. Trent v. Commissioner,291 F.2d 669 (2d Cir. 1961), revg. 34 T.C. 910 (1960). Therefore a taxpayer may establish the requisite business nexus for deductibility of a bad debt under section 166(a) by proof that his dominant motivation in creating or securing the debt was to protect his salary and job. United States v. Generes,supra;Shinefeld v. Commissioner,65 T.C. 1092, 1099 (1976). While petitioner has pointed to certain cases that indicate that a business bad debt may arise if the dominant motive for making the loan is anticipated income, these cases have facts totally distinguishable from the facts in the instant case. In Putoma Corp. v. Commissioner,66 T.C. 652, 674 (1976), affd. 601 F.2d 734 (5th Cir. 1979), we stated "a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than promote a future one. Putting funds at risk under such circumstances is more characteristic of the investor." [Fn. *45 ref. omitted.] In the Putoma Corp. case we further pointed out that the record did not support the conclusion that the taxpayer would not have obtained the anticipated salary absent making the loan. The same is true of the record in this case. In United States v. Generes,supra, the Supreme Court stated that a taxpayer's dominant motivation in making a loan should be determined from the objective facts and not from the taxpayer's subjective self-serving statement of his motives. In the instant case the objective evidence points to an investment motive on the part of petitioner in making the loans to AAA. Petitioner had invested $30,000 in cash in AAA and given a $70,000 note for the balance of his payment for his investment. He was not an employee of AAA and at the time of the loans did not anticipate becoming an officer or employee. He had a well-paying position with Alabama Wood which he could keep if he wished to do so and received no salary as an officer of Abbeville Wood. Not only did petitioner make loans to AAA but so did other stockholders. All these facts support an investment motive on the part of petitioner in making the loans to AAA. We *46 conclude that petitioner's dominant motive in making loans to AAA was to protect his investments and to facilitate possible appreciation of his stock rather than to protect his anticipated salary and employment, if any. In United States v. Generes,supra, the Supreme Court compared the taxpayer's $12,000 annual salary with his original investment in the corporation of $38,900 and concluded that the objective evidence showed that the taxpayer's interest as an employee was not the dominant motivation for the loan. Here petitioner had no salary from AAA and an investment of $30,000 cash and a note for $70,000. On the basis of the record, we conclude that the loans petitioner made to AAA are deductible only as nonbusiness bad debts. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
2. The parties have agreed that the transfers were loans.↩
3. Since petitioner does not contend that he was in the trade or business of developing companies for resale, we will not further discuss this contention of respondent.↩